**FIRST ATLANTIC LEASING CORP., Plaintiff,**

v.

**Thomas M. TRACEY, Defendant/Third–Party Plaintiff,**

v.

**FIRST ATLANTIC SAVINGS & LOAN ASS'N, Third–Party Defendant.**

**Civ. A. No. 89–1009.**

United States District Court, D. New Jersey.

June 1, 1990.

Edward A. Bertele, Levy & Lybeck, Union, N.J., for defendant/third-party plaintiff.

Paul E. Stevenson, Apruzzese, McDermott, Mastro & Murphy, Liberty Corner, N.J., for third-party defendant.

## OPINION

HAROLD A. ACKERMAN, District Judge.

### I. *Introduction*

This action is presently before this Court upon a motion by third-party defendant, First Atlantic Savings & Loan Ass'n, ("First Atlantic"), for a substitution of par-

ties and for summary judgment on all counts of defendant/third-party plaintiff's, Thomas M. Tracey's, ("Tracey's"), third-party complaint. This suit was originally commenced in the New Jersey State Courts as an action by First Atlantic Leasing Corporation to repossess an automobile used by Tracey during his employment with First Atlantic which was terminated on May 6, 1988. Tracey was ordered to return the automobile to First Atlantic Leasing Corporation on August 22, 1988, and thus, that aspect of this case has been resolved; plaintiff, First Atlantic Leasing Corporation, is no longer involved in this suit. However, on or about July 20, 1988, Tracey had filed a third-party complaint against First Atlantic for, *inter alia*, an alleged wrongful discharge, and First Atlantic filed a counterclaim against Tracey for breach of his fiduciary obligations. The case was removed to this Court on March 13, 1989.

The issues presently before the Court involve only the wrongful discharge and other related claims filed by Tracey against First Atlantic. Specifically, Tracey has asserted claims for breach of written and oral employment agreements; wrongful discharge in violation of public policy; breach of Tracey's right of privacy in his banking records at First Atlantic; and violations of the Employee Retirement Income Security Act, ("ERISA"), 29 U.S.C. § 1001, *et seq.*, for an alleged failure to provide Tracey with his pension benefits, information, and severance pay. In addition, Tracey claims that First Atlantic is estopped from refusing to pay severance to him as a result of representations made by First Atlantic and its treatment of other terminated employees. First Atlantic argues that each of these claims are without merit and that it is entitled to summary judgment as a matter of law.

## II. *Substitution of Parties*

Before addressing the arguments made on the summary motion, I note that First Atlantic has argued that the Resolution Trust Corporation, ("RTC"), should be substituted as the third-party defendant in this litigation, in place of First Atlantic, pursuant to Federal Rule of Civil Procedure 25. Subsection (c) to this rule provides that "[i]n case of any transfer of interest, *the action may be continued by or against the original party*, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party." *Fed.R.Civ.P.* 25(c) (emphasis added).

First Atlantic asserts that, on February 23, 1990, RTC was appointed as its Conservator and succeeded to all its rights, titles, powers and privileges. *See* First Atlantic's Brief at 30; Affidavit of Richard C. McDonough, filed April 19, 1990, ("McDonough Aff."), ¶ 11. First Atlantic further asserts that RTC has dissolved the Board of Directors of First Atlantic. McDonough Aff., ¶ 11. Tracey has not responded to this aspect of First Atlantic's motion. Nevertheless, I find that the requested substitution should not be granted at this time. Rule 25 provides that an action may continue by or against the original party, even after a transfer of interest. First Atlantic's affidavit of service indicates that it has provided no notice of its motion to RTC, and the Court, therefore, does not have the benefit of RTC's position as to whether it should be made a party to this action with or in place of First Atlantic. Accordingly, First Atlantic's motion for a substitution of parties is hereby denied at this time, without prejudice.

## III. *Summary Judgment Motion*

### A. Standard of Review

Rule 56 of the Federal Rules provides that "judgment ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.Pro.* 56(c). The moving party has the initial burden of satisfying this summary judgment standard. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). To satisfy its

burden, the moving party may simply point out to the Court that there is an absence of evidence to support any essential element of the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *see also Peters Tp. School Dist. v. Hartford Acc. & Indemn. Co.,* 833 F.2d 32, 34 (3d Cir.1987).

In opposing summary judgment, the non-moving party cannot rely upon the allegations of his pleadings. He must come forward with evidence to show that there is a material fact in dispute which requires "a jury or judge to resolve the parties differing versions of the truth at trial." *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). A material fact is one that may affect the outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The non-movant must come forward with more than a scintilla of evidence to defeat summary judgment, but he need not have a preponderance of the evidence. *Williams · v. Borough of West Chester, Pa.,* 891 F.2d 458, 460 (3d Cir. 1989). All inferences to be drawn from the facts should be resolved in favor of the nonmoving party. *Peters Tp. School,* 833 F.2d at 34.

With these standards in mind, I shall review each of Tracey's claims and First Atlantic's related arguments.

**B. Plaintiff's Claims**

**(1) *Count One: Breach of Written Contract of Employment***

■ First Atlantic argues that there was no valid written contract of employment between First Atlantic and Tracey, because a condition precedent to the validity of the contract at issue never occurred. First Atlantic argues that its conversion from a mutual association to a stock association was a condition precedent to the effectiveness of the agreement at issue. It is undisputed that on June 16, 1987, a contract of

employment was executed between Tracey and Gerald R. O'Keefe, the then president of First Atlantic. *See* First Atlantic's Brief, Exhibit B; *see also* Certification of Thomas M. Tracey, filed May 14, 1990, ("Tracey Cert."), Exhibit A. The preamble to this agreement provides that

> WHEREAS the Board of Directors of the Association [First Atlantic] has approved and authorized the entry into this Agreement with the Employee *to take effect on the first day of the month following the date of completion of the conversion under the plan ....*

*See* Agreement, p. 1, ¶ 3 (emphasis added).

The provision of the contract relating to the term of the employment agreement provides:

> The initial term of employment under this Agreement shall commenc[e] ... on the first day of the month following the date of completion of the conversion of the Association from a New Jersey chartered mutual association to a ... stock association....

*See id.,* p. 3, ¶ 5.

■ Based on these provisions, it is clear that conversion of First Atlantic from a mutual association to a stock association was a condition precedent to the validity of this agreement. The agreement specifically provides that it is "to take effect on the first day of the month following the ... conversion...." The term of the agreement begins to run only after the conversion takes place. It is undisputed that the proposed conversion never occurred. *See* McDonough Aff., ¶ 3 and p. 3; *see also* Tracey's Opposition Brief at 2.[1] A party relying upon an alleged contract has the burden of proving its validity. *Doyle v. Northrop Corp.,* 455 F.Supp. 1318, 1329 (D.N.J.1978). In addition, where a promise is subject to a condition, no liability can arise upon that promise if the condition is not met. *See Am. Handkerchief Corp. v. Frannat Realty Co.,* 17 N.J. 12, 20, 109 A.2d 793 (1954).

---

**1.** Tracey's brief is not paginated. For purposes of reference, the Court has numbered the pages consecutively with page one being the first page

on which text appears together with the heading "Nature of the Case."

Tracey raises no arguments opposing First Atlantic's motion as to the alleged written contract of employment. Rather, Tracey merely argues that, based upon First Atlantic's oral representations made to him over the years, he had a lifetime employment contract terminable only for cause.[2] However, there is no genuine issue of material fact that a condition precedent to the validity of this employment contract never occurred, namely, conversion of the association to a stock association. Accordingly, summary judgment will be granted in favor of First Atlantic on Count One of Tracey's third-party complaint.

### (2) Count Two: Wrongful Discharge in Violation of Public Policy

█ First Atlantic argues that it is entitled to summary judgment as a matter of law on Tracey's public policy/wrongful discharge claim, because the record, when viewed as a whole, demonstrates that the motivating factor behind Tracey's termination was Tracey's improper involvement in various real estate transactions. In response, Tracey argues that there is a question of fact as to whether he was discharged because he wrote a letter to the Federal Home Loan Bank Board, (the "FHLBB"), advising it of improper transactions in which First Atlantic's president, Gerald O'Keefe, was involved.

### (a) Undisputed Facts Relating to Public Policy/Wrongful Discharge Claim

Mr. Tracey was first employed by First Atlantic in April, 1963. See Tracey Cert., ¶ 2. He moved through the ranks and at some point, he obtained the position of Executive Vice President which is the position he held until he was terminated. Id. A focal point of this dispute concerns a letter, dated December 24, 1987, by which FHLBB notified First Atlantic that it should conduct an investigation and provide a detailed accounting concerning a series of transactions involving Shamu Associates. See McDonough Aff., ¶ 5 and Exhibit B. In this letter, FHLBB stated that the transactions "raise[d] serious questions concerning the conduct of certain senior officers and directors" at First Atlantic, as the transactions appeared to "be a conflict of interest and usurpation of corporate opportunity." Id. The individual officers and directors identified by FHLBB as involved in the transactions were "Executive Vice President and Director Tracey, Senior Vice President and Director Beahan, Senior Vice Presidents Doer and Ferretti, and Vice President Wagner." See id. President O'Keefe was identified as having obtained an apparently unrelated loan, the significance of which was uncertain at that time. Id.

As a result of FHLBB's letter, First Atlantic conducted an investigation through the Audit Committee of its Board of Directors. McDonough Aff., ¶ 6. The Audit Committee submitted its report to the Board of Directors of First Atlantic on March 16, 1988. Id., ¶ 9. In its report, the Committee had found that Tracey and other officers engaged in real estate transactions which involved serious breaches of fiduciary and professional duties, all without the knowledge of the outside directors of First Atlantic's Board. Id. It was further found that Mr. Tracey's involvement in the real estate deals and his compensation from same exceeded that of all the other officers of First Atlantic. Id., ¶ 9(c). Thus, the Committee recommended that Mr. Tracey's employment, as well as that of John E. Beahan, be terminated. McDonough Aff., ¶ 6, 9(c).

In the meanwhile, Mr. Tracey had discovered that FHLBB was investigating the subject transactions; he was shown a copy of its December, 1987 letter in January, 1988. See Tracey Cert., ¶ 6. Mr. Tracey states that, at that time, he "anticipated

---

**2.** In the statement of facts section of his brief, Tracey admits that the contingency never occurred, but he asserts that he continued to receive the salary and other benefits which had been set forth in the agreement. See Tracey's Brief at 2. However, Tracey also indicates that, according to the agreement, his salary and job title remained the same. See Tracey Cert., ¶ 4. Thus, even if the argument had been raised by Tracey, it does not appear that First Atlantic's payment of the same salary to him could constitute a waiver of the contingency relating to the conversion.

that the Board of Directors would stand behind [him] and other officers because [they] had done nothing wrong, had not benefitted financially from these transactions and if we had violated any banking regulation, it was unintential [sic] and ha[d] not resulted in any loss to the Bank." Tracey Cert., ¶ 6. Thereafter, during an interview with the Audit Committee, Mr. Tracey expressed concerns about transactions in which President Gerald O'Keefe was involved, but, according to Tracey, Mr. McDonough, a member of the Committee, refused to listen and stated that he was "more concerned with rumors about [Tracey] than facts about O'Keefe." *Id.*

After having become aware of the investigation into his transactions and having been interviewed by the Audit Committee, in February, 1988, Mr. Tracey drafted a letter to FHLBB advising it in detail about the transactions in which President O'Keefe was allegedly involved. *Id.*, ¶ 6. Notably, this letter, which was sent anonymously, was not mailed until April 26, 1988, over a month after the Audit Committee had recommended that Mr. Tracey be terminated from his employment. *Id.*, Exhibit C. Thereafter and on May 4, 1988, a special Board of Directors meeting was called and Tracey appeared with his attorney. McDonough Aff., ¶ 6. The minutes of this meeting state that

> [t]he Board was advised that the Audit Committee had met with supervisory personnel at the Federal Home Loan Bank of New York on February 10, March 9 and 16, and April 5 and 18 and was told orally to dismiss the three senior officers and if the Board did not do so, the Federal Home Loan Bank Board could initiate removal proceedings which will cast a 'black cloud' over the Association.

*See* McDonough Aff., Exhibit C.

The Board voted to request Mr. Tracey and Mr. Beahan to submit their resignations by 4:00 p.m. on Friday, May 6, 1988, or be terminated. *Id.*, at 2–3. Mr. Beahan resigned, but Mr. Tracey did not and was terminated for cause on May 6, 1988. *Id.*, ¶ 6. Tracey asserts that, during the special Board of Directors meeting on May 4, 1988,

"Chairman of the Board Richard McDonough brought up the letter" that Mr. Tracey had sent to FHLBB on April 26, 1988, and "was very upset about what had been said in it." Tracey Cert., ¶ 7. Finally, I note that in September, 1988, Mr. Tracey entered into a Consent Order with FHLBB prohibiting him from participating in the conduct of the affairs of First Atlantic or any related companies and from voting for any director or "serving as a director, officer or employee of any institution the accounts of which are insured by the [Federal Savings and Loan Insurance Corporation]" or any related companies. *See* Tracey Cert. ¶ 10; *see also* First Atlantic's Brief, Exhibit A.

### (b) Legal Issues Relating to Public Policy/Wrongful Discharge Claim

In *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505 (1980), the New Jersey Supreme Court held that "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." *Id.* at 72, 417 A.2d 505. *Pierce* involved a situation where the employee claimed she was terminated as a result of her refusal to participate in a project which she believed would require her to violate the Hippocratic oath which she took as a doctor. *Id.* at 63, 417 A.2d 505. Although the Court recognized the cause of action for wrongful discharge in violation of public policy, it nevertheless held that summary judgment should have been granted in favor of the defendant-employer, because the controversy merely involved a difference in medical opinions and plaintiff was not asked to engage in a project which constituted a violation of a clear mandate of public policy. *Id.* at 75, 417 A.2d 505. The Court indicated that the interests of the employee, the employer, and the public must be balanced in recognizing this cause of action. *Id.* at 71, 417 A.2d 505. *See also Lepore v. National Tool and Mfg. Co.*, 224 N.J.Super. 463, 471, 540 A.2d 1296 (App. Div.1988), *aff'd*, 115 N.J. 226, 557 A.2d 1371 (1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 366, 107 L.Ed.2d 353 (1989) (holding that employee may maintain retaliatory dis-

charge claim where he alleged that he was terminated for reporting violations of the Occupational Safety and Health Act).

In order to maintain a *Pierce* claim, plaintiff must demonstrate "that he was in fact discharged in retaliation for taking action in opposition to corporate action which violates a clear mandate of public policy." *House v. Carter–Wallace, Inc.,* 232 N.J.Super. 42, 54, 556 A.2d 353 (App. Div.1989), *cert. denied,* 117 N.J. 154, 564 A.2d 874 (1989). In *House,* the employee had opposed the company's decision to sell certain batches of toothpaste which the employee suspected may have been contaminated. He was terminated three months later, because he was "politically unacceptable," and was not doing a proper job. *Id.* at 47, 556 A.2d 353. The Appellate Division opined that House failed to show that his opposition was a cause for his termination, because it appeared that no one at the company resented his opposition to the marketing of the toothpaste. *Id.* at 54, 556 A.2d 353. Likewise, in *Galante v. Sandoz, Inc.,* 192 N.J. Super. 403, 470 A.2d 45 (Law Div.1983), *aff'd,* 196 N.J.Super. 568, 483 A.2d 829 (App.Div.1984), *appeal dismissed,* 103 N.J. 492, 511 A.2d 665 (1986), the court granted summary judgment in favor of the defendant-employer on the grounds that plaintiff failed to show that his filing for workmen's compensation benefits entered into the decision to discharge him. *Id.* at 405, 408, 470 A.2d 45. Rather, the evidence demonstrated that plaintiff was terminated for a legitimate, good faith reason: excessive absenteeism. *Id.*

■ Needless to say, in the face of *Pierce,* an employer must be permitted to discharge an employee for legitimate reasons which do not contravene public policy. In this respect, I believe that an employer may defend an action for an alleged retaliatory discharge on the grounds that the employee was discharged for legitimate business reasons which do not contravene public policy. The employee should then be permitted to show that the employer's proffered reasons are a mere pretext for the retaliation. *Compare Chipollini v. Spenc-*

*er Gifts, Inc.,* 814 F.2d 893, 898 (3d Cir.) (in banc), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987), holding that, in a Title VII case, after a plaintiff has established a *prima facie* case of discrimination and defendant has rebutted the *prima facie* case with legitimate reasons for its actions, the plaintiff must come forward with evidence "to show that the defendant's proffered reason is a pretext for discrimination, *i.e.* that the proffered reason is merely a fabricated justification for discriminatory conduct." *See also Duffy v. Wheeling Pittsburgh Steel Corp.,* 738 F.2d 1393, 1395 (3d Cir.1984), *cert. denied,* 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984) (same).

Here, First Atlantic has come forward with legitimate business reasons for discharging Mr. Tracey. In particular, FHLBB requested that Tracey and others be investigated for improper real estate transactions in which they were engaged while officers of First Atlantic. Mr. Tracey admits that he engaged in the transactions. The Audit Committee investigated the charges and recommended that Tracey's employment be terminated. In addition, there is an absence of evidence to suggest that First Atlantic's proffered reason is a pretext for an alleged retaliation. Mr. Tracey admittedly was aware of the FHLBB's inquiries *before* he drafted the letter, and the Audit Committee investigated the charges and recommended that Tracey be terminated *before* he sent any communications outside First Atlantic. Thus, First Atlantic had good cause to terminate Tracey before a basic foundation to a Pierce claim had been established. *Compare House v. Carter–Wallace, Inc., supra,* 232 N.J.Super. at 49, 556 A.2d 353 ("the mere voicing of opposition to corporate policy within a corporation provides an insufficient foundation for assertion of a *Pierce* claim").

In support of his claim that he was fired in retaliation for reporting Mr. O'Keefe's improper transactions, Tracey relies primarily upon the fact that Mr. O'Keefe was not fired at the same time he was, but he was forced to resign over a year later. *See* Tracey's Brief at 13. However, I do not

see how Mr. O'Keefe's retention creates an inference of retaliation against Mr. Tracey on the part of First Atlantic. Indeed, FHLBB's letter of December, 1987 did not request an investigation into Mr. O'Keefe's accounts, but stated that "we are less certain what significance to attach to the loan to President O'Keefe." *See* McDonough Aff., Exhibit B. In addition, Mr. Beahan, about whom the Board did request an investigation, was terminated at the same time as Tracey. Moreover, the record reveals that, prior to his discharge and in early 1988, FHLBB informed First Atlantic that removal proceedings would be instituted if Tracey was not terminated. Further, First Atlantic could not have continued to employ Tracey for as long as O'Keefe was employed, inasmuch as Tracey entered into a Consent Order shortly after his termination agreeing not to work for First Atlantic or any other federally insured bank. Accordingly, the undisputed facts demonstrate that First Atlantic discharged Tracey for legitimate business reasons not in violation of public policy and there is an absence of evidence to show that First Atlantic's proffered reasons are pretextual.

██ Beyond this, even if Tracey could demonstrate that the investigation into his real estate deals was a mere "pretext" for the alleged retaliatory discharge, First Atlantic would still be entitled to summary judgment. In *Citizens State Bk. of N.J. v. Libertelli*, 215 N.J.Super. 190, 521 A.2d 867 (App.Div.1987), the court held that a banking officer cannot maintain an action for a retaliatory discharge for complaining of alleged violations of the Banking Act. In *Libertelli*, the Court recognized that the New Jersey Banking Act authorizes the board of directors of a New Jersey bank to terminate its officers "at its pleasure." *See id.* at 193, 521 A.2d 867 and *N.J.S.A.* 17:9A–112. Referring to this provision, the court in *Libertelli* held that

> The policy of the Banking Act to regulate the conduct of banks and their board members should not be used to undermine the clear provision of *that same statute* permitting termination of officers at will. *Termination of a bank officer for protesting directors' impro-*

*prieties is not barred by public policy* arising from a regulatory scheme which specifically permits the termination and contains effective other means of dealing with those improprieties.

215 N.J.Super. at 196, 521 A.2d 867 (emphasis added).

*Libertelli* was distinguished in *Potter v. Village Bank v. New Jersey*, 225 N.J.Super. 547, 543 A.2d 80 (App.Div.1988), *certif. denied*, 113 N.J. 352, 550 A.2d 462 (1988). In *Potter*, the plaintiff was the president and chief executive officer of the defendant, the Village Bank of New Jersey, (the "Village Bank"). *Id.* at 550, 543 A.2d 80. While holding this position, the plaintiff reported to the New Jersey Commissioner of Banking that he suspected that drug money was being laundered at the Village Bank. *Id.* at 552, 543 A.2d 80. Plaintiff contended that, after he made this report, several of the board of directors questioned him about it, and "from that point on, he was isolated from running the bank effectively since his subordinates in the bank were ordered not to talk to him." *Id.* at 554, 543 A.2d 80. Later, the board asked him to leave the bank. The Appellate Division held that plaintiff could maintain an action for a retaliatory discharge, because "the public policy of the State of New Jersey should protect at will employees— including bank presidents—who in good faith blow the whistle on one or more bank directors suspected of laundering money from illegal activities." *Id.* at 560, 543 A.2d 80. The court distinguished *Libertelli*, stating that

> Potter did much more than 'protest the director's improprieties' relating to a regulatory scheme. He blew the whistle on suspected criminal conduct involving one or more directors. Hence, Potter's termination relates to the public policy designed to encourage citizens to report suspected criminal violations to the proper authorities in order to ensure proper enforcement of both state and federal penal laws.

*Id.* at 559, 543 A.2d 80.

Therefore, a comparison of *Potter* and *Libertelli* demonstrates that public policy

does not forbid termination of a banking officer for reporting violations of the Banking Act, although public policy forbids termination of a banking officer for reporting violations of criminal or other laws.[3] However, the instant case merely involves allegations that Tracey reported violations of the "banking regulations." Although no case law or specific regulations are identified, Tracey states in his brief that he "contacted the Federal Loan Bank prior to his discharge in order to express his concern that the conduct of the then President Gerald O'Keefe was in violation of *banking regulations.*" Tracey's Brief at 12 (emphasis added). In his certification, Tracey refers to the subject matter of his reports as "what I considered to be financial improprieties." *See* Tracey Cert., ¶ 6. The letter that Tracey sent to FHLBB further illuminates that he was primarily complaining that O'Keefe was drawing checks on insufficient funds and waiving late fees in violation of bank policy and/or banking regulations. Thus, under *Pierce* and *Libertelli*, plaintiff cannot make out a claim for wrongful discharge in violation of public policy.

For all the foregoing reasons, summary judgment will be granted in favor of First Atlantic on Count Two of Tracey's third-party complaint.

### (3) *Count Three: Breach of an Oral Employment Agreement*

■ With regard to Tracey's claim of an oral employment contract, First Atlantic initially argues that Tracey's claim is barred by *Savarese v. Pyrene,* 9 N.J. 595, 599, 89 A.2d 237 (1952), which requires that the terms of an alleged oral contract of lifetime employment be precise and definite. Apparently, First Atlantic has been of the impression that Tracey claimed a lifetime contract of employment protecting him from *any* termination, with or without cause, because *Savarese* applies only to

such claims. *See Shebar v. Sanyo Bus. Sys. Corp.,* 111 N.J. 276, 287–88, 544 A.2d 377 (1988). In the event Tracey were to make such a claim, I would agree that *Savarese* bars his recovery; Tracey has merely alleged that he was told by First Atlantic's officers that he "would have a job there for as long as [he] wanted." Tracey Cert., ¶ 2. *Compare Savarese, supra.*

■ However, in response to this motion, Tracey only claims that he had a oral contract of employment with First Atlantic providing that he could be terminated for cause. *See* Tracey's brief at 7. Indeed, Tracey has alleged that the terms of his alleged oral contract were incorporated into the written agreement which was executed in July 6, 1987. *See* Tracey Cert., ¶ 4 ("I signed an agreement dated July 6, 1987 which contained all of the terms and conditions which were then a part of the verbal understanding which I had with the Bank over all of those years"). This agreement provides that

> [t]he employee's employment under this Agreement may be terminated at any time by the Board of Directors of the Association. Any termination by the Association other than for 'cause' shall not prejudice the Employee's right to receive compensation in accordance with Section 2 of this Agreement.

*Id.,* Exhibit A, at ¶ 6.

Thus, it is clear that this agreement would have permitted First Atlantic to terminate Tracey with or without cause.[4] Since Tracey does not allege a lifetime contract of employment regardless of cause for termination, *Savarese* does not apply and Tracey's claims are governed by *Shebar. See, e.g., Shebar, supra,* at 288, 544 A.2d 377. Applying *Shebar* to the facts at hand, it is clear that there is a genuine issue of material fact as to whether there was an oral contract of employment. Tra-

---

**3.** *Potter* and *Libertelli* can also be distinguished on the grounds that *Potter* involved a situation where the improprieties were reported to an outside authority, whereas in *Libertelli,* the plaintiff did not report the violations but simply "insisted on following sound and lawful banking practices and would not go along with the

self-dealing improprieties of board members." 215 N.J.Super. at 194, 521 A.2d 867.

**4.** This may account for Tracey's allegations in his third-party complaint that he was an employee "at will." *See* Third Count of the Third–Party Complaint, p. 6, ¶ 2.

cey contends that oral representations were made to him that he would have a job at First Atlantic for life and that, in reliance upon these representations, Tracey declined employment opportunities elsewhere. *See* Tracey Cert., ¶¶ 2–4; *compare Shebar, supra,* at 288–89, 544 A.2d 377.

Nevertheless, I find that summary judgment should be rendered in favor of First Atlantic. Tracey asserts that he could have been terminated for cause; First Atlantic has asserted that Tracey was discharged for "very good" cause, (*see* McDonough Aff., ¶ 6; *see also* First Atlantic's Reply Brief at 6); and I find that there is no genuine issue of material fact that First Atlantic had such cause to terminate Tracey. *See supra* at Section III.A(2)(a); *see also* McDonough Aff., ¶ 9; Tracey Cert., ¶¶ 6, 10. Therefore, assuming that there was a valid oral contract of employment, there is no genuine issue of material fact that the contract alleged by Tracey was not breached and summary judgment is granted to First Atlantic on Count Three of Tracey's third-party complaint.[5] In light of this disposition, I need not address First Atlantic's additional argument that the alleged oral agreement is preempted by the federal Financial Institutions Reform, Recovery and Enforcement Act of 1989, 12 U.S.C. §§ 1821(d)(9)(A) and 1823(e).

#### (4) *Count Four: Breach of Tracey's Right of Privacy in his Banking Records at First Atlantic*

Tracey has asserted a claim for breach of an alleged financial right of privacy in his financial records resulting from an internal examination of the bank's records during its investigation of the charges made by FHLBB against Tracey and the other officers. I have previously held in this case that First Atlantic acted entirely within its rights, and did not violate any rights of Tracey, when it reviewed its records of Tracey's accounts. *See First Atlantic*

*Leasing Corp. v. Tracey,* 128 F.R.D. 51, 57 (D.N.J.1989). Tracey has not opposed First Atlantic's motion relating to the Fourth Count of his third-party complaint and accordingly, I will grant First Atlantic's motion and dismiss this count of the third-party complaint.

#### (5) *Count Five: Alleged Violations of ERISA, 29 U.S.C. § 1001, et seq., for failure to provide Tracey with pension benefits and information*

In the Fifth Count of the third party complaint, Tracey alleges that First Atlantic violated Section 206 of ERISA, 29 U.S.C. § 1056, by failing to pay him his pension benefits within 60 days after the close of the plan year and by failing to provide him with information concerning these benefits.

##### (a) Payment of Benefits

■■■ It is undisputed that, in December, 1988, Tracey received both his 401K distribution in the amount of $36,091.77 and his pension benefits under the "Defined Contribution Pension Plan" in the amount of $44,350.24. *See* Tracey Cert., ¶ 11, and Affidavit of Patricia F. Bell, Vice President–Manager of Compensation of Benefits, April 18, 1990, ("Bell Aff."), ¶ 6. Mr. Tracey has not disputed that the aforementioned amounts were accurate. The parties are also in agreement that Mr. Tracey received his distribution under the "Defined Benefit Pension Plan" on October 27, 1989, approximately seventeen months after his termination. *See* Tracey Cert., ¶ 11; and Bell Aff., ¶ 8. Ms. Bell asserts that Tracey was paid $122,309.80 in October, 1989, and Mr. Tracey asserts that he received approximately $118,000.00. Mr. Tracey apparently contends that the amount of the proceeds he received in October, 1989, was less than that to which he was entitled. *See* Tracey's Brief at 14 and Exhibit Pa 2.

---

**5.** Although First Atlantic did not specifically move for summary judgment on these grounds, the issue of the cause for Tracey's termination is embodied in, and was addressed by the parties in connection with, Tracey's retaliatory discharge claim. It was also clearly raised in First Atlantic's reply papers. Further, the court has the power to grant summary judgment in favor

of a nonmoving party. *See Denzer v. Purofied Down Products Corp.,* 474 F.Supp. 773, 774 (S.D.N.Y.1979), *citing Morrissey v. Curran,* 423 F.2d 393, 399 (2d Cir.), *cert. denied,* 399 U.S. 928, 90 S.Ct. 2245, 26 L.Ed.2d 796 (1970). Since Tracey admits the facts which establish the cause for his discharge, summary judgment is appropriate.

Mr. Tracey's date of birth is September 29, 1940, and thus, he is now almost fifty-years old. *See* Bell Aff., ¶ 4. The normal retirement age for First Atlantic is sixty-five, (*id.*), and there is no time period under which an employee must receive his pension benefits under either of the pension plans in which Mr. Tracey participated. *See id.*, ¶¶ 2–3.

Tracey has referred this Court to no case law in support of his position that he did not receive his pension benefits in a timely manner, but rather, it appears that he relies exclusively upon Section 206 of ERISA. This section provides, in pertinent part, that

Each pension plan shall provide that unless the participant otherwise elects, the payment of benefits under the plan shall ... begin not later than the 60th day *after the latest* of the close of the plan year in which—

(1) ... the participant attains the earlier of age 65 or the normal retirement age specified under the plan, ....

(2) ... the 10th anniversary of the year in which the participant commenced participation in the plan; *or*

(3) the participant terminates his service with the employer.

29 U.S.C. § 1056(a) (emphasis added).

The courts have uniformly interpreted this provision to mean that an employee under the age of sixty-five cannot compel the payment of pension benefits, unless the plan specifically provides otherwise. *See Wolcott v. Nationwide Mut. Ins. Co.*, 664 F.Supp. 1533, 1539, 1543 (S.D.Ohio 1987), *aff'd in part, revs'd in part on other grounds*, 884 F.2d 245 (6th Cir.1989); *Fine v. Semet*, 514 F.Supp. 34, 41 (S.D.Fla.1981), *aff'd*, 699 F.2d 1091 (11th Cir.1983); *Mo-*

*rales v. Plaxall, Inc.*, 541 F.Supp. 1387, 1390–91 (E.D.N.Y.1982); *Denzer v. Purofied Down Products Corp.*, 474 F.Supp. 773, 775 (S.D.N.Y.1979) ("Congress never intended to impose upon a plan a requirement that any benefits be payable before age sixty-five"), *citing Riley v. MEBA Pension Trust*, 452 F.Supp. 117, 120 (S.D.N.Y.1978), *aff'd*, 586 F.2d 968 (2d Cir.1978).

It is undisputed that Tracey is under the age of sixty-five and the plans in which he participated did not provide that benefits would be distributed at an earlier date. Although Tracey apparently claims that his benefits previously became vested, (*see* Tracey's Brief at 15), the vesting of benefits does not require that they be paid immediately. *See Budwig v. Natelson's Inc. Profit Sharing Retirement Plan*, 576 F.Supp. 661, 667 (D.Neb.1982), *aff'd*, 720 F.2d 977 (8th Cir.1983) ("While Budwig's rights to the policy vest immediately, it does not follow that delivery must take place immediately"); *see also Moehle v. NL Indus., Inc.*, 646 F.Supp. 769, 771 (E.D.Mo. 1986), *aff'd*, 845 F.2d 1027 (8th Cir.1988) (employees' ERISA claims, filed before they reached the plan's retirement age, were dismissed as premature even though their benefits were fully vested).

Accordingly, since Tracey is under the age of sixty-five and since the plan at issue does not provide for an early retirement age, Tracey's claim that the distribution of his pension benefits to him was untimely lacks merit and will be dismissed. However, to the extent Mr. Tracey alleges that he was not paid the amount of contributions required under his plans, an issue of fact exists as to whether he has received the amounts to which he was entitled.[6]

---

**6.** First Atlantic strenuously objects to this claim, arguing Tracey "has never asserted a claim in his [twice-amended] complaint that the pension benefits paid to him were somehow improperly calculated", and that "the letter from Mr. Garfield is nothing but a last ditch desperate attempt to inject a controversy where none had previously existed." First Atlantic's Reply Brief at 10. However, Tracey's first amended third-party complaint alleges that "[Tracey] has requested that [First Atlantic] deliver the monies representing his benefits but Third Party Defendant has failed to do so." *See* Third–Party Com-

plaint, Count Five, p. 3, ¶ 6. In addition, the addendum clause requests an order "compelling [First Atlantic] to provide [Tracey] with pension benefits and information to which he is entitled...." *Id.*, p. 5, ¶ (a). Thus, it appears that Tracey's complaint provides sufficient notice that he claims that he has not received the benefits to which he is entitled. *See Rose v. Bartle*, 871 F.2d 331, 355 (3d Cir.1989) ("Under the modern federal rules [of civil procedure], it is enough that a complaint put the defendant on notice of the claims against him. It is the

Inasmuch as the trustee of Tracey's benefit plans has exercised his discretion and distributed Tracey's benefits at an early date, I believe that Tracey's claims that he was not paid the proper amount need not be dismissed as premature. Accordingly, First Atlantic's motion for summary judgment on Count Five of the third-party complaint is granted to the extent Tracey complains that the payment of his benefits was untimely, but it is denied to the extent Tracey claims that he has not received the amount of benefits to which he is entitled.

### (b) Providing of Information

■ In Count Five of his third-party complaint, Tracey also alleges that he has not been provided with information concerning his pension plans in violation of Section 104 of ERISA, 29 U.S.C. § 1024. First Atlantic claims that Tracey's claims in this respect are barred, because he has failed to exhaust administrative remedies in that he has not submitted a written request for pension information to the plan administrator.

Tracey has not identified the specific provision of ERISA under which he is proceeding, the particular documents with which he allegedly has not been supplied, or any case law in support of his claims. *See* Tracey's Brief at 16–17. Nonetheless, it appears that he is proceeding under Section 104(b)(4) of ERISA which provides, in part, that

> The administrator shall, *upon written request of any participant or beneficiary,* furnish a copy of the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. . . .

29 U.S.C. § 1024(b)(4) (emphasis added).[7]

If the plan administrator fails to respond to a written request in thirty days, then a court, in its discretion, may assess a penalty on the administrator in an amount of up to $100 per day. *See* 29 U.S.C. § 1132(c)(1)(B). *See also Kelly v. Chase Manhattan Bank,* 717 F.Supp. 227, 233 (S.D.N.Y.1989).

It is undisputed that Tracey never made a written request for information before this suit was instituted. *See* Bell Aff., ¶ 5; Tracey Cert., ¶ 11. Under the pension plan, all requests for information must be submitted directly to First Atlantic. Bell Aff., ¶ 5. However, Tracey argues that, *after* this suit was filed, his attorney requested the documentation from First Atlantic's attorney in the form of a Notice to Produce, but that same was not forthcoming "until a few months ago." Tracey's brief at 16. In other words, Tracey claims that, although he did not have facts sufficient to support his claim when he filed his third-party complaint, he developed such facts *after* the third-party complaint was filed, and therefore, he is entitled to proceed with this action.

I reject Tracey's position. Pursuant to the statute at hand, Tracey is required to make a request to the administrator of the plan and wait thirty days before he can *commence* suit. The exhaustion requirement has generally been applied in cases involving an alleged denial of benefits, (*see, e.g., Denton v. First Natl. Bank of Waco, Texas,* 765 F.2d 1295, 1300–01 (5th Cir. 1985), *reh'g denied,* 772 F.2d 904 (5th Cir. 1985), and *Shawver v. R.H. Macy & Co., Inc.,* 697 F.Supp. 1515, 1522 (W.D.Mo. 1988)),[8] and I believe that a party should

---

function of discovery to fill in the details, and of trial to establish each element of the cause of action").

**7.** The only allegation in Tracey's pleadings relating to his claim that First Atlantic failed to provide him with information is set forth in paragraph six to Count Five which alleges that "[Tracey] has also requested information about his benefits but [First Atlantic] has failed to disclose same." *See* amended third-party complaint, Count Five, p. 3, ¶ 7.

**8.** It does not appear that the doctrine relating to exhaustion of administrative remedies necessarily requires that this suit be dismissed, as this action could be stayed pending Tracey's pursuit of such remedies. *See Evans v. Midland Enterprises, Inc.,* 704 F.Supp. 106, 107 (M.D.La.1989). In addition, the doctrine relates to exhaustion of *remedies* and not the accrual of a cause of action in the first instance. Nevertheless, application of this doctrine to ERISA cases demonstrates that pension plan beneficiaries should be

not be permitted to commence suit *before* his cause of action has even accrued. *See Playboy Enter., Inc. v. Chuckleberry Pub.*, 486 F.Supp. 414, 435 (S.D.N.Y.1980) ("[p]arties should not be encouraged to sue before a practical need to do so has been clearly demonstrated").[9] Further, it appears that this Court lacked jurisdiction over Tracey's Section 104 claim at the time the suit was filed, because the suit was filed prematurely and thus, there was no "ripe" case or controversy. *See, e.g., Insurance Co. of N. America v. United States*, 561 F.Supp. 106, 117–118 (E.D.Pa. 1983) ("[t]he suit against the US was commenced prematurely and the court lacked subject matter jurisdiction over the claims against the US at the time it was filed"), *citing Morano v. U.S. Naval Hospital*, 437 F.2d 1009 (3d Cir.1971), and other cases.

■ Beyond this, even if it could be said that the premature filing of Tracey's suit was cured by his Notice to Produce documents, plaintiff must demonstrate that "he has suffered some degree of harm resulting in the delay" in his receipt of information to have a valid claim under ERISA. *See Kelly v. Chase Manhattan Bank*, 717 F.Supp. 227, 233 (S.D.N.Y.1989) (granting summary judgment in favor of employer on grounds that employee failed to articulate sufficient prejudice resulting from the delay in his receipt of pension plan information). It appears that Tracey cannot make such a showing here. Tracey had already been terminated for cause before he made any requests for pension information, and he admits he received all documentation several months ago, during the pendency of this suit. *Compare Shlomchik v. Retirement Plan of Amalgamated Ins.*, 502 F.Supp. 240, 245 (E.D. Pa.1980), *aff'd*, 671 F.2d 496 (3d Cir.1981) (granting judgment in favor of employer because "[p]laintiff ha[d] not shown that he would have changed his plans and *would not have retired* in 1978 had he received a copy of the Plan within the 30 day period,

or that failure to receive a copy in any way influenced his actions *with respect to retirement*") (emphasis added). Accordingly, for all the foregoing reasons, First Atlantic's motion for summary judgment on Count Five of the third-party complaint will be granted to the extent Tracey asserts a claim under ERISA for First Atlantic's alleged delay in providing pension plan information.

(6) *Count Six; Tracey's Claims that First Atlantic is Estopped from Refusing to Pay Him Severance*

■ In the Sixth Count of his third-party complaint, Tracey asserts that First Atlantic is "estopped" from denying him severance benefits. First Atlantic moves for summary judgment on this claim arguing that there is no evidence of detrimental reliance by Tracey upon the "discussions ... regarding a *possibility* of giving [him] severance benefits," because he was going to be terminated regardless of the outcome of the severance discussion. *See* First Atlantic's Brief at 25 (emphasis in original). First Atlantic further argues that Mr. Tracey has no right to rely upon said discussions concerning the possibility of severance. *Id.*

On the other hand, Mr. Tracey claims that, during the special meeting of the Board of Directors on May 4, 1988, (at which he was asked to resign), his attorney advised the board that Tracey would *consider* submitting his resignation together with a "severance package." Tracey Cert., ¶ 7. At that time, the Board adopted a resolution indicating that the personnel committee was authorized to provide a severance package which would be discussed at a later date. Tracey Cert., ¶ 7; *see also* McDonough Aff., Exhibit C, p. 2, ¶ 1 ("The Personnel Committee was authorized by the Board *to negotiate* with Mr. Tracey the terms of severance") (emphasis added). Tracey further claims that he relied upon

---

encouraged to attempt to resolve their controversies with the plan administrators before filing suit.

9. This finding is buttressed by Rule 11 which requires that a pleading be "well grounded in fact and [ ] warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law ..." Fed.R.Civ.P. 11.

this authorization, as well as First Atlantic's policy of providing severance pay to others in the past, in entering the Consent Order with the FHLBB in September, 1988. *Id.*, ¶ 10. Tracey asserts that he would not have entered into the Consent Order had he not been of the impression that he would be receiving severance pay from First Atlantic. *Id.*

Tracey has, once again, failed to refer this Court to any case law in support of his promissory estoppel claim. To establish a claim for promissory estoppel, Tracey must demonstrate the existence of four factual elements:

(1) clear and definite promise by the promisor;

(2) promise must be made with the expectation that the promisee will rely thereon;

(3) promisee must in fact reasonably rely upon the promise; and

(4) detriment of a definite and substantial nature must be incurred in reliance on the promise.

*Royal Associates v. Concannon*, 200 N.J. Super. 84, 91, 490 A.2d 357 (App.Div.1985); *Fairken Assoc. v. Hutchin*, 223 N.J.Super. 274, 280, 538 A.2d 465 (Law Div.1987).

■ It is not necessary for me to decide whether Tracey could establish detrimental reliance by reason of his entering into a Consent Order with FHLBB, because I agree with First Atlantic that, under the doctrine of promissory estoppel, Tracey was not entitled to rely upon the discussions concerning the possibility that he might receive severance pay. As the above cited cases make clear, in order for a promise to be sustained on the theory of promissory estoppel, there must first be a clear and definite promise. In his brief, Tracey does not contend that any such promise was made, but only that "the Board of Directors on May 4, 1988, specifically determined that its personnel committee should enter into *negotiations* to determine the

amount of severance payments to Mr. Tracey." Tracey's Brief at 17. Likewise, Tracey's certification makes similar references to proposals, negotiations and the like. No clear *promise* is set forth. In addition, there is no evidence that First Atlantic intended Tracey to rely upon any such promise, had one been made. Rather, First Atlantic maintains that the discussions concerning severance pay were made at a time when it had already decided that Tracey would either resign or be terminated.

■ I realize that Tracey also contends that First Atlantic had a general company-wide policy of providing severance pay to terminated officers, (*see* Tracey Cert., ¶ 9), and that, in reliance on this policy, he "made a conscious decision to continue with the Bank up to the time that the Board of Directors made its decision." *Id.*, ¶ 10. Although the New Jersey Supreme Court has held that a company-wide policy in a *written* employment manual, distributed to its employees, may provide a basis for an employment contract for job security, (*see Woolley v. Hoffman–La Roche, Inc.*, 99 N.J. 284, 491 A.2d 1257 (1985)), the Court has not yet passed on the issue of whether *Woolley* should be extended to orally communicated company-wide policies. *See Shebar, supra*, 111 N.J. at 288, 544 A.2d 377.

■ I do not believe that such an extension of *Woolley* is warranted under the facts of this case. The company manual in *Woolley* provided the specific terms of the promise in question, namely, job security for those who performed their duties efficiently and effectively. *See* 99 N.J. at 287 & n. 2, 491 A.2d 1257. In contrast, the terms or guidelines to be used in the instant case are far from clear. Indeed, Tracey admits that there were variations in First Atlantic's severance policy, (*see* Tracey's Brief at 20), and it appears that he is unable to articulate the amount of severance pay to which he claims he is entitled.[10]

---

10. The closest Tracey comes to stating a figure is at paragraph nine of his certification in which he states "in anticipation of an adverse decision by the Board, in May, 1988, I spoke to Edwin Starner, Director of Human Resources at First

Atlantic, to get his feelings about how much severance I might receive in the event I were fired. He acknowledged that given my contribution to the Bank over the 25 years that I had been associated with it, that he felt that two

*Compare Kane v. Milikowsky*, 224 N.J.Super. 613, 616, 541 A.2d 233 (App.Div.1988) (declining to extend *Woolley* where *written* memorandum did not comprehensively treat the subject of employment termination); *Ware v. Prudential Ins. Co.*, 220 N.J.Super. 135, 146–47, 531 A.2d 757 (App. Div.1987), *certif. denied*, 113 N.J. 335, 550 A.2d 450 (1988) ("If the document was intended to serve as a handbook guaranteeing employee benefits, it would be reasonable to expect that it also would *specifically* set forth those benefits") (distinguishing *Woolley* ) (emphasis added). In the absence of express terms conveyed to specific employees, an employer should not become legally bound to treat each and every employee in the same fashion based upon past policies and practices. *See, e.g., Linn v. Beneficial Commercial Corp.*, 226 N.J.Super. 74, 80, 543 A.2d 954 (App.Div.1988) ("It cannot be fairly said that an employer commits itself to keep an employee indefinitely by promoting him, asking him to transfer and assisting him with expenses"), and *McQuitty v. General Dynamics*, 204 N.J.Super. 514, 519–20, 499 A.2d 526 (App. Div.1985) (rehiring of employee and continued employment after a strike does not evidence an implied contract).

For all the foregoing reasons, I find that Tracey's claim that First Atlantic is estopped from denying him severance benefits is without merit. Accordingly, I will grant First Atlantic's motion on Count Six of the third-party complaint and this count will be dismissed.

(7) *Count Seven: Alleged Violations of ERISA for failure to provide severance pay*

■■■ Tracey contends that First Atlantic's policy and practice of providing severance pay to terminated officers was an "employee welfare benefit plan" within the meaning of ERISA.[11] First Atlantic argues that it had no such policy and practice and that further, even if it had, it acted within its discretion in denying severance benefits to Tracey. First Atlantic asserts that severance was determined on a case-by-case and strictly discretionary basis, (McDonough Aff., ¶ 10), and Tracey agrees that there were variations in the payment of benefits. *See* Tracey's brief at 20. As I have indicated above, it is undisputed that there was no written policy for the payment of severance.

Assuming, without deciding, that ERISA applies, I find that, under the circumstances of this case, First Atlantic's decision to deny Tracey severance was not an abuse of discretion.[12] Although Tracey asserts that First Atlantic deviated from its previous practice of providing severance pay to terminated officers, (Tracey Cert., ¶ 9), it is undisputed that no severance pay was provided to any of the officers [13] who were asked to resign and/or who were terminated as a result of the real estate and related transactions which gave rise to Mr. Tracey's discharge. *See* McDonough Aff., ¶¶ 8, 10. Mr. Tracey had engaged in transactions, without the knowledge of the outside Board of Directors, which were considered by the Audit Committee of the Bank and the FHLBB to present conflicts of interest and usurpations of corporate opportunity. Mr. Tracey received more compensation from these transactions than any other person involved, and, although the Audit Committee initially recommended that Tracey pay restitution, (*see* McDon-

---

weeks per year of service was reasonable." Tracey Cert., ¶ 9.

**11.** Plaintiff does not claim that the alleged plan for severance pay was an "employee pension benefit plan" under ERISA. It appears that such a claim could not legitimately be made. *See Wolcott v. Nationwide Mut. Ins. Co.*, 664 F.Supp. 1533, 1537–38 (S.D.Ohio 1987) (holding that an extended earnings plan was not an employee pension benefit plan, because the payment of benefits was not contingent upon retirement or the employee attaining a certain age).

**12.** Tracey concedes that, assuming ERISA applies, the decision to deny him severance pay is subject to "a standard of arbitrary and unreasonableness." *See* Tracey's Brief at 20. *See also Shawver v. R.H. Macy & Co., supra*, 697 F.Supp. at 1524 ("the arbitrary and capricious standard has generally been used to govern judicial review of plan administrators' decisions pertaining to severance pay plans").

**13.** These officers include Mr. Tracey, Mr. Beahan, Mr. George Ferretti, and Mr. O'Keefe. *See* McDonough Aff., ¶ 8.

ough Aff., ¶ 9(c)), ultimately, no such request was made. In light of these circumstances, even if the denial of severance to Mr. Tracey was a deviation from prior practice, I find that the decision to deny him severance was not an abuse of discretion. *See Fine v. Semet, supra,* 514 F.Supp. at 42–43 (action which was inconsistent with that accorded other plan participants merely shifted the burden to the defendants to justify their actions as consistent with their fiduciary duties as trustees). Accordingly, First Atlantic's motion is granted with respect to Count Seven of Tracey's third-party complaint.

## IV. *Conclusion*

For all the foregoing reasons, I am denying First Atlantic's motion for substitution of parties at this time, without prejudice. I am granting First Atlantic's motion for summary judgment and dismissing Counts One, Two, Three, Four, Six, and Seven of Tracey's third-party complaint. I am also granting First Atlantic's motion as to Count Five of the third-party complaint to the extent Tracey makes claims for failure to timely provide pension benefits and pension information. However, I deny First Atlantic's motion to the extent Tracey claims that the pension benefits he received were less than that to which he is entitled.