232 N.J. Super. 42 (1989)
556 A.2d 353
D. LARRY HOUSE, PLAINTIFF-APPELLANT,
v.
CARTER-WALLACE, INC., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 10, 1988.
Decided April 4, 1989.
*43 Before Judges BRODY, ASHBEY and SKILLMAN.
James Katz argued the cause for appellant (Tomar, Seliger, Simonoff, Adourian & O'Brien, attorneys; Ronald Graziano and James Katz, on the brief).
Keith A. Krauss argued the cause for respondent (Connell, Foley & Geiser, attorneys; Richard Catenacci and Keith A. *44 Krauss, of counsel; Maureen A. Mahoney and Keith A. Krauss, on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
This is a wrongful discharge case. On January 24, 1983, defendant Carter-Wallace, Inc. (Carter-Wallace) terminated plaintiff D. Larry House, the Vice President of Production and Distribution in its manufacturing division.
On August 29, 1985, House filed a four count complaint seeking reinstatement and back pay as well as compensatory and punitive damages. Count one alleged that Carter-Wallace terminated House in violation of public policy in retaliation for his opposition to the distribution of certain allegedly contaminated batches of Pearl Drops, a brand of tooth polish manufactured by Carter-Wallace. Count two alleged that Carter-Wallace breached a covenant of good faith and fair dealing implicit in its employment of House. Count three alleged that Carter-Wallace's termination of House violated procedural and substantive protections guaranteed to employees through internal company memoranda. Count four alleged that Carter-Wallace's termination of House constituted an intentional infliction of emotional distress.
On February 13, 1987, the trial court delivered an oral opinion and signed an order granting Carter-Wallace summary judgment with respect to the second, third and fourth counts of House's complaint. After the parties submitted substantial additional materials, the trial court delivered a second oral opinion on March 13, 1987 granting summary judgment on count one.[1] An order embodying this ruling was signed on March 16, 1987.
*45 On appeal, House argues in a four point brief that the trial court erred in dismissing each of the four counts of his complaint. We conclude that summary judgment was properly granted and therefore affirm.

I
On January 17, 1983, Michael J. Kopec, President of the Manufacturing Division and House's immediate superior, sent a memorandum to Daniel J. Black, the President and Chief Operating Officer of Carter-Wallace, entitled "Manufacturing Division Organizational Assessment." One section of this memorandum recommended House's termination as follows:
For the last four years I have been generally positive regarding Mr. House's performance. This view was reflected in the merit increases he's been granted from 1978 through 1981. Clearly, Mr. House is a hard working and very dedicated and loyal manager who has consistently given his best effort on behalf of the Company.
It's clear that during the course of the last one to two years very negative perceptions concerning Mr. House's performance have developed. In my view they have developed as a result of his style, as well as the performance of elements within our organization for which he is responsible.
House is very detail oriented, almost to a fault. He insists on being as intimately involved as he possibly can in almost every element within his areas of responsibility. Over the past two years, however, it's clear that his focus has been primarily on Carter Operations and insufficient attention has been given to the Plant operations, primarily those in Cranbury. On a confidential basis I was informed by a recruiter who is presently working in our behalf that during an interview for a position outside Carter-Wallace, Mr. House characterized his efforts as being broken down as 80% in Carter Operations, with the balance spread over his other areas of responsibility. Observations tend to bear this out in that he appears to spend more time with individual planners within the Carter Operations Group than he does with Mr. Osowick attending to major operating problems, concerns, and opportunities within the Cranbury Plant.
As a result of Mr. House's orientation to detail and insistence upon intimate involvement, I don't believe he has effectively delegated where delegation of authority and responsibility should have been made, and as a result, some of the key managers who report to him have neither developed nor performed up *46 to their capabilities. This is a definite concern regarding Mr. Osowick, the Director of Manufacturing at Cranbury.
In many ways Mr. House has been overprotective of those who report to him and, again, this has stifled their development, as well as having contributed to negative impressions concerning the way in which he runs his operations. He is often too quick to jump to the defensive and as a result of a sometimes parochial view of things, fails to recognize the totality of a situation. As a result, his judgment is often questioned. During the initial production campaign for Sea & Ski at Fluid Packaging Company he became so immersed in who was at fault, as well as taking all possible steps to insure that product could be made available when needed, that he failed to recognize, project, and then report the consequences of his actions as they impacted costs.
Mr. House's dedication to getting the job done on time at all costs is in many ways applaudable and even considering the Sea & Ski problems at Fluid, the course of action taken was undoubtedly the correct one. However, as I have discussed with him on a number of occasions, the real failure was in recognizing the cost implications and making them known. The same type of situation developed during the first Golden Dome promotion for aerosols. Because of equipment failures and in the final analysis inadequate equipment, an extraordinary amount of hand labor was required in order to provide the finished goods as required by Marketing. Mr. House focused solely on getting the product out on time and in the end result we found that an unfavorable variance of $250,000 had accumulated. Again, all things considered, I don't know that we would have proceeded any differently. The failure, again, was in recognizing the magnitude of potential variances and then projecting and communicating them to Management.
While the services provided the Carter Division by Mr. House and the Carter Operations group have been good, as have those provided by Distribution and Lambert Kay Operations, we have been plagued by a number of operating problems in the Cranbury Plant which have not in my opinion been addressed on either a timely or adequate basis. While recognizing that the Cranbury operations is a difficult and complex one to manage, as I look back retrospectively I can only conclude that when Mr. House and that element of his organization react to problems, there has not been an adequate amount of proaction. In other words, there has been a lack of initiative relative to taking positive steps to preclude the reoccurrence of past problems and mistakes. Numerous processing errors, primarily in weighing and ingredient addition, have resulted in considerable rework, spoiled and unusable, and a product recall. It seems that only as a result of the urging of the GMP Audit Committee and finally my demanding that an analysis be performed, have we assessed possibilities associated with a central dispensing approach geared to improving weighing out ingredients. While we are continuing to assess central dispensing pharmacy, an alternate short term solution is being recommended for implementation in 1983/84.
In addition, the long standing problems and concerns regarding metal contamination were not pursued aggressively by Mr. House's organization. Months of meetings and deliberations concerning the best approach went on before I *47 finally had to call it to the attention of Mr. House and request that it be focused on, a plan developed, and then steps taken to implement. Similarly, we've had ongoing concerns about human hair contamination in tablets. Beyond implementing a costly Lakso inspection of finished tablets, which is of course an after the fact effort, there has been insufficient effort directed at the basic causes.
Without further recitation of past problems, it is clear that serious deficiencies have continued to exist. This, coupled with the fact that for whatever the reasons may be, Mr. House has alienated and lost credibility with a number of key executives he must interface with, raises a very serious question regarding his continued role within our organization.
* * * * * * * *
It is with regret that I recommend that Mr. House's employment be terminated. In view of the foregoing I see no other option without sacrificing the future effectiveness of key elements within the Manufacturing Division. While it is conceivable that he could be effective in a diminished role, perhaps responsible for Carter and Lambert Kay Operations and Distribution, I don't believe this would be an acceptable or workable alternative. I will consult with Mr. Conant and at an appropriate time provide you with a recommended termination package.
Kopec's recommendation was accepted by Black, and on January 24, 1983, Kopec notified House that he was being terminated. According to House, Kopec told him that he was being terminated because he was "politically unacceptable." According to Kopec, "[r]ather than embarrass or humiliate [House] by going through a litany of his failures, I simply told him that I didn't feel he was doing the job properly and that he had lost the confidence and respect of too many of his peers and elsewhere in the organization at the same or higher level."
After the termination, Carter-Wallace provided House with an office, secretary and employment counselling to assist him in finding a new job. House also received severance pay and psychiatric counselling at Carter-Wallace's expense. Carter-Wallace continued to provide these benefits until October 1983 when House obtained new employment.
House alleges that the reasons set forth in Kopec's memorandum for his termination were pretextual and that the actual reason for his termination was his opposition to Carter-Wallace's distribution of certain batches of allegedly contaminated *48 Pearl Drops tooth polish. This product was manufactured under House's supervision at a plant in Puerto Rico. In September 1982, Carter-Wallace became aware through its own quality control procedures that certain batches of Pearl Drops might be contaminated. Consequently, Carter-Wallace temporarily quarantined those batches and had its Quality Control Division conduct extensive tests. As a result, the Quality Control Division concluded that one batch was contaminated and made arrangements for it to be disposed. However, the Quality Control Division concluded that the remaining quarantined batches were not contaminated and authorized their distribution.
House attended several internal corporate meetings held during October 1982 regarding the Pearl Drops contamination problem. He alleges that at one of these meetings he voiced opposition to the corporate decision to distribute some of the quarantined batches of the product. According to House, his opposition to this decision was strongly criticized by others at the meeting. House never put any of his alleged objections in writing nor did he ever communicate his objections to anyone outside of the corporation.
House claims, relying upon Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980), that the termination of his employment was in retaliation for his alleged opposition to the distribution of the Pearl Drops and therefore violated a clear mandate of public policy. In Pierce, the Court held that an employee has a cause of action for a discharge which violates a clear mandate of public policy contained in legislation, judicial decision, administrative rule, regulation or decision or a code of professional conduct designed to protect the public interest. 84 N.J. at 72.
However, no New Jersey case has recognized a claim for wrongful discharge based solely upon an employee's internal complaints about a corporate decision, where the employee has failed to bring the alleged violation of public policy to any *49 governmental or other outside authority or to take other effective action in opposition to the policy. Thus, both Lepore v. National Tool and Manufacturing Co., 224 N.J. Super. 463 (App.Div. 1988), certif. granted 111 N.J. 642 (1988) and Cerracchio v. Alden Leeds, Inc., 223 N.J. Super. 435 (App.Div. 1988), held that an employee who is discharged for actually reporting alleged workplace safety violations to the Occupational Safety and Health Administration could maintain an action for wrongful discharge. And Kalman v. Grand Union Co., 183 N.J. Super. 153 (App.Div. 1982), held that a pharmacist discharged for refusing to close a pharmacy while other parts of the store in which it was located remained open, in violation of rules of the Board of Pharmacy, could maintain an action. But Pierce held that a mere difference of professional opinion between an employee and those with decision making power in a corporation is not a sufficient basis to establish a wrongful discharge. 84 N.J. at 75. Therefore, the mere voicing of opposition to corporate policy within a corporation provides an insufficient foundation for assertion of a Pierce claim. Compare Potter v. Village Bank of New Jersey, 225 N.J. Super. 547, 555-561 (App.Div. 1988), certif. den. 113 N.J. 352 (1988), with Citizens State Bank of New Jersey v. Libertelli, 215 N.J. Super. 190, 194-196 (App.Div. 1987).
Other jurisdictions have also generally limited an employee's cause of action for a discharge based on opposition to an employer's conduct which violates public policy to situations where the employee has complained to an outside party or taken other action reasonably calculated to prevent the objectionable conduct. See, e.g., Garibaldi v. Lucky Food Stores, Inc., 726 F.2d 1367 (9th 1984), cert. den. 471 U.S. 1099, 105 S.Ct. 2319, 85 L.Ed.2d 839 (1985) (milk truck driver who reported to local department of health that employer had ordered him to deliver spoiled milk); Knight v. American Guard & Alert, Inc., 714 P.2d 788 (Alaska 1986) (security guard who reported alcohol and drug use by other guards to company for which security services were provided); Wagner v. Globe, 150 Ariz. *50 82, 722 P.2d 250 (1986) (police officer who reported illegal detention to magistrate); Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471, 427 A.2d 385 (1980) (employee who refused to commit violations of state food and drug legislation which would have exposed him to criminal prosecution); Wheeler v. Caterpillar Tractor Co., 108 Ill.2d 502, 92 Ill.Dec. 561, 565, 485 N.E.2d 372, 376 (1985), cert. den. 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 187 (1986) (employee who refused to handle radioactive material in violation of regulations of Nuclear Regulatory Commission); Phipps v. Clark Oil & Refining Corp., 408 N.W.2d 569 (Minn. 1987) (employee who refused to pump leaded gasoline in violation of Clean Air Act). Where employees' claims have been recognized based solely on internal complaints, it has been under circumstances where the employees have threatened to report the alleged violation of public policy to outside parties but been terminated before their complaints could be made. See, e.g., Parnar v. Americana Hotels, Inc., 65 Haw. 370, 652 P.2d 625 (1982) (employee allegedly discharged to prevent her from testifying regarding violations of antitrust laws by employer); Boyle v. Vista Eyewear, Inc., 700 S.W.2d 859, 870-878 (Mo. Ct. App. 1985) (employee of eye glass manufacturer who threatened to report violations of federal regulations to the Food and Drug Administration); McQuary v. Bel Air Convalescent Home Inc., 69 Or. App. 107, 684 P.2d 21 (1984), review den. 298 Or. 37, 688 P.2d 845 (1984) (nurse who threatened to report abuse of patient in nursing home to state health department but was fired before she had opportunity to file complaint). Cf. Kansas Gas & Elect. Co. v. Brock, 780 F.2d 1505 (10th Cir.1985), cert. den. 478 U.S. 1011, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986) and Mackowiak v. University Nuclear Systems, Inc., 735 F.2d 1159, 1162 (9th Cir.1984) (construing provisions of Energy Reorganization Act to extend protection to safety inspectors in facilities regulated by Nuclear Regulatory Commission who file adverse internal safety reports required to be kept on file by employer).
*51 House's actions with respect to the quarantined Pearl Drops were limited to allegedly expressing his opposition to the distribution of the product at a meeting with other executives of the corporation and later communicating those feelings to his immediate supervisor. However, House did not take any steps to notify the Food and Drug Administration or any other outside agency that his corporation was distributing an allegedly contaminated product. In fact, he did not even attempt to convey his views directly to the top management of Carter-Wallace. Furthermore, since three months elapsed between the meeting at which House learned that the quarantined Pearl Drops would be distributed and his discharge, there is no basis for inferring that Carter-Wallace discharged House in order to prevent him from communicating his alleged views regarding the Pearl Drops to outside parties. Thus, House did not take, or threaten to take, effective action to prevent distribution of the product, and in our view his alleged objections to distribution of the contaminated Pearl Drops, expressed only to other executives of the corporation, do not provide grounds for maintenance of a wrongful discharge claim under Pierce.[2]
Furthermore, even if a cause of action were maintainable for a retaliatory discharge based solely on an employee's internal expressions of disagreement with corporate policy, House did not have a reasonable belief that the quarantined Pearl Drops were contaminated. House is not a microbiologist (his college education consisted of an undergraduate program in which he had majored in "food technology" and minored in biology) and he was not directly responsible for quality control at Carter-Wallace. Quality control was the responsibility of Dr. Daoust, a Ph.D. in microbiology and the head of Carter-Wallace's *52 Quality Control Division. Subsequent to the original discovery of the suspected contaminated batches of Pearl Drops, Dr. Daoust and his staff conducted extensive testing and eventually concluded that the quarantined Pearl Drops could be distributed without danger to the public and in compliance with the law. House was not involved in this testing. In fact, he did not even see the results of the tests conducted subsequent to the initial quarantine of the product. Furthermore, House exhibited only a limited understanding of the subject of biological contamination and the applicable statutes and regulations. In his deposition, House gave the following testimony:
Q. Something occurred between the first meeting and the second meeting which you indicated appeared to have changed Doctor Daoust's mind.
A. That's correct.
Q. Do you know what that was?
A. Yes, sir, I believe I do.
Q. And what was it?
A. That now the  the longer they tested it the more negative results they got.
Q. Did Doctor Daoust so indicate?
A. They got more negative results?
Q. Right.
A. Yes.
Q. All right. Did Doctor Daoust indicate to you why they were getting more negative results?
A. Because of the germicidal products of Pearl Drops.
* * * * * * * *
Q. The second meeting, Doctor Daoust indicated that the samples were negative. Do you know what that meant. What he meant by that?
A. He hadn't been able to culture any organisms out of those samples.
* * * * * * * *
Q. Do you have any reason to believe that Doctor Daoust was lying when he said the samples were negative?
A. No, sir.
* * * * * * * *
Q. After receiving D-2, and D-3, and writing D-5, so we're now up to November 3rd, 1982. Did you have anything further to do with discussions about the Pearl Drops, about whether it should be shipped or not shipped, or *53 whether it was still contaminated or what the test results showed or anything of that nature, after November 3rd?
A. Not that I recall.
Q. Have you ever seen the testing results that were done on Pearl Drops?
A. I don't know if I've seen all of them. I believe  I don't believe I actually saw the papers with the count on it. I believe they were all responded to by Frank Dondershine. I did see results of testing taken in Puerto Rico.
* * * * * * * *
Q. Do you know whether this product is even  it is, in fact, controlled by any specific federal Food and Drug Administration requirements?
A. I believe so.
Q. What, which ones?
A. I can't say specifically, because I don't remember the law numbers and so forth.
Q. What are you talking, in terms of what?
A. There are numerous statements in there, one that says if there is a major breakdown of procedures during manufacture. The batch is not salable or usable, it's an adulterated batch because it has excessive amount of organism in it. Dead bodies or not.
The foregoing excerpt from House's deposition shows that, even under House's view of the operative facts, the objections which he expressed regarding the distribution of the quarantined batches of Pearl Drops were made without detailed knowledge of the tests which were conducted on the product or an understanding of the significance of the test results. Therefore, even if House in fact believed that those batches of Pearl Drops should not be shipped, he did not have a reasonable basis for that belief. Hence, he was not entitled to legal protection for whatever views he may have expressed within the corporation. Cf. Pierce v. Ortho Pharmaceutical Corp., supra; see also Warthen v. Toms River Community Memorial Hospital, 199 N.J. Super. 18 (App.Div. 1985), certif. den. 101 N.J. 255 (1985); N.J.S.A. 34:19-3.
Furthermore, the record before the court on the motions for summary judgment did not contain sufficient evidence from which it could be inferred that the reason for House's discharge was the alleged opposition he expressed to the distribution of the quarantined Pearl Drops. To establish a claim under *54 Pierce, an employee must show that he was in fact discharged in retaliation for taking action in opposition to corporate action which violates a clear mandate of public policy. Galante v. Sandoz, Inc., 192 N.J. Super. 403, 407-408 (Law Div. 1983), aff'd 196 N.J. Super. 568 (App.Div. 1984), appeal dism. 103 N.J. 492 (1986). In this case, the alleged connection between the opposition House expressed in October 1982 to distribution of the quarantined batches of Pearl Drops and his discharge nearly three months later was wholly speculative. When House was asked at his deposition whether anyone at Carter-Wallace ever expressed disapproval of his opposition to the distribution of the allegedly contaminated Pearl Drops, he responded as follows:
Q. Were you aware of any individual at Carter-Wallace who, following your opposition, expressed any opinion about  other than Mr. Scotto saying you were crazy at that meeting, any opinion as to the position you had taken?
A. No.
Q. Did you continue to deal with Doctor Daoust?
A. Yes.
Q. Fine. Did he ever give you any indication that he bore any resentment toward you?
A. No.
Q. Did he ever give you any indication that he bore any ill will or  for any position you may have taken with respect to Pearl Drops?
A. No.
Q. I'll ask the same question of each of the other individuals who were present at the meeting. Maybe I can shorten it up.
Did any of the individuals who were present at that meeting ever give you any indication that they bore any resentment or ill will or bad feelings because of the position you had taken?
A. Those at the meeting?
Q. Yes.
A. No.
Q. Anyone else at Carter-Wallace?
A. No.
Despite the absence of any tangible evidence that anyone at Carter-Wallace resented his opposition to the distribution of the Pearl Drops, House testified that he "knew" his job performance had been exemplary and therefore inferred that his position with respect to the distribution of the Pearl Drops had to *55 have been the reason for his discharge. However, House is unable to point to any testimony or document which provides even a scintilla of direct or indirect support for his feeling that his discharge was retaliatory.
For these reasons, we agree with the trial court that, as in Pierce, plaintiff House "has not alleged facts that would support an action for damages for the termination of [his] employment." 84 N.J. at 65.

II
We reject House's other claims substantially for the reasons expressed in the trial court's oral opinion of February 13, 1987. We add the following additional comments.
In Citizens State Bank of N.J. v. Libertelli, supra, 215 N.J. Super. at 190, which was decided by this court on February 9, 1987 and hence not brought to the attention of the trial court, we expressly stated that "New Jersey courts have not invoked the implied covenant of good faith and fair dealing to restrict the authority of employers to fire at-will employees." 215 N.J. Super. at 194.
House's argument that Carter-Wallace violated rights established by an internal company memorandum requiring "corporate approval" prior to the discharge of any employee with 15 or more years of service or who is over the age of 50 is without merit. This internal memorandum was not "widely distributed through the company." Moreover, the record does not reflect that plaintiff received the memorandum at any time during his employment. An employee cannot have a reasonable expectation of job security based on a document which was not distributed to him. Ware v. Prudential Ins. Co., 220 N.J. Super. 135, 144-146 (App.Div. 1987), certif. den. 113 N.J. 335 (1988). In any event, House's termination was based on written recommendations to the President and Chief Operating Officer of Carter-Wallace. Thus, his termination was approved at the *56 highest level of the corporation, in conformity with the direction in the memorandum upon which he relies.
Accordingly, the judgment dismissing House's complaint is affirmed.
NOTES
[1] At this time, Carter-Wallace apparently consented to a dismissal without prejudice of a counterclaim which it had filed against House. However, insofar as we can determine, no order embodying that dismissal has ever been entered.
[2] Because House was discharged in 1983, the Conscientious Employee Protection Act, L. 1986, c. 105, N.J.S.A. 34:19-1 et seq., does not apply to his claim. Consequently, we have no occasion to decide whether the kind of disagreement with corporate policy expressed by House could provide a basis for an action for retaliatory discharge under N.J.S.A. 34:19-3(c).