711 A.2d 951

RICHARD BECK, PLAINTIFF–APPELLANT, v. CLAUDE TRI-BERT AND HOWDEN FOOD EQUIPMENT INCORPO-RATED, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued May 12, 1998—Decided June 15, 1998.

Before Judges LONG, STERN and KLEINER.

*Judson A. Parsons, Jr.* argued the cause for appellant.

*Anthony Palmisano, Jr.* argued the cause for respondents (*McCarter & English,* attorneys; *Penelope M. Taylor,* of counsel; *Ms. Taylor* and *Mr. Palmisano,* on the brief).

The opinion of the court was delivered by

KLEINER, J.A.D.

On December 31, 1990, plaintiff Richard Beck filed a complaint alleging that his former employer, defendant Howden Food

Equipment, Inc. (Howden), and its divisional president, defendant Claude Tribert, committed slander, violated the New Jersey Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 *et seq.* (CEPA), interfered with his advantageous relations, and committed a *prima facie* tort, which essentially was a claim of common law wrongful discharge.

■ Through a series of motions brought by defendants, partial summary judgment was granted as to each of plaintiff's claims.[1] Plaintiff appeals. We affirm and conclude that: (1) CEPA does not apply to post-employment retaliatory negative references; (2) plaintiff's CEPA claim for retaliatory discharge was time-barred, *see N.J.S.A.* 34:19–5; (3) plaintiff's common law wrongful discharge claim was properly dismissed on summary judgment because he reported defendants to OSHA *after* he was fired; (4) plaintiff was not entitled to partial summary judgment that his termination was in retaliation for attempting to protect his right to a safe workplace; (5) plaintiff's slander claim was properly dismissed pursuant to *Mick v. American Dental Ass'n,* 49 *N.J.Super.* 262, 139 *A.*2d 570 (App.Div.), *certif. denied,* 27 *N.J.* 74, 141 *A.*2d 318 (1958), and the *Restatement (Second) of Torts* §§ 577, 584; and (6) plaintiff's claim for interference with advantageous relations with prospective employers was properly dismissed for lack of sufficient evidence.

## I

Plaintiff was hired by the Solbern Division (Solbern) of defendant Howden on August 6, 1987, to supervise its stockroom at an annual salary of $30,874. On January 11, 1989, plaintiff wrote a note to defendant Tribert, stating: "The outside crane and hoist is not safe in present condition. The beam needs repair. The safety

---

[1] Defendant Tribert had filed an answer and a counterclaim alleging slander. When plaintiff's complaint was dismissed, the trial court, with the consent of the parties, dismissed without prejudice defendant's counterclaim, thus permitting plaintiff's appeal from a final judgment of dismissal.

does not work on the hoist. The switch still operates after releasing the up or down button. Please have the repairs made asap." Plaintiff was terminated on March 9, 1989. After his termination, plaintiff advised OSHA of various dangerous conditions at the Solbern facility. OSHA conducted an inspection of the Solbern facility on May 9, 1989, and cited the company for certain violations but found nothing wrong with the outside crane and hoist.[2]

Between March 1989 and November 1990, using a resume that listed Solbern as his immediate past employer, plaintiff received, but did not accept, at least six offers of employment after contacting about 125 potential employers. Although pre-trial discovery revealed that plaintiff maintained records of the 125 companies to whom he applied for employment, he never contacted these companies to ask why he had not received an offer of employment or whether they had received a negative reference from Tribert or Solbern. Tribert, however, admitted at his deposition that he informed one unidentified prospective employer in July or August 1990 that plaintiff reported Howden to OSHA and that plaintiff "might be known as the type of person that called OSHA."

In November 1990, plaintiff and his friend, Stanley Halley, discussed the idea that Tribert may be giving plaintiff negative job references. Plaintiff and Halley agreed that Halley would pose as a prospective employer to Tribert in order to elicit Tribert's comments. Together, they drafted a letter on fictitious letterhead and plaintiff mailed the letter to Tribert. Tribert spoke with Halley later that month.

In his conversation with Tribert, Halley intended to find out if Tribert was "causing Mr. Beck not to be able to get any meaningful employ.... I didn't care whether he agreed or disagreed

---

[2] In a certification filed by plaintiff in response to one of defendants' motions for partial summary judgment, he contended that OSHA inspected only a one-ton crane but had failed to inspect the two-ton crane, which was the subject of plaintiff's complaint. This distinction is irrelevant to the disposition of this appeal.

[with that]. I was just wondering whether he was the man who was giving Mr. Beck a bad time getting employed." Halley thought he could find out this information "[b]y finding out if this is the man who does not think Mr. Beck is a person of quality to hire."

According to Halley,

[Tribert] brought up the point that Mr. Beck was mingling with other employees and always trying to make deals, buying or selling something. And he also went on to tell me that Mr. Beck called OSHA on the company, which caused a lot of problems to the company. He called OSHA after his employment was terminated at Solbern. And after we had this little discussion I told Mr. [Tribert] that I thought it would probably be a good idea then maybe if we too did not hire Mr. Beck, and [Mr. Tribert] thought it was a very good idea not to be involved with Mr. Beck.

Thereafter, Halley informed plaintiff of the contents of this conversation. Plaintiff then removed his employment at Solbern from his resume.

Shortly thereafter, on December 17, 1990, plaintiff requested that another friend, John Donnell, pose as a prospective employer to find out what Tribert was saying about him. The following conversation ensued:

TRIBERT: ... [W]ould you like to know what I feel about [plaintiff]?

DONNELL: Yes, if you could tell me that.

TRIBERT: Well basically the gentleman is an average worker.

DONNELL: Yes.

TRIBERT: I don't care too much for his character. I mean that has nothing to do with the job.

DONNELL: Right.

TRIBERT: I had to, eventually because of that, I had to still do something, so I discharged him. And in return he filed a complaint with the OSHA people by planting a piece of evidence that didn't exist before his departure, which, you know, certainly upset me to no end but in any case.

DONNELL: That is something. In terms of—although that presents a problem which I'll have to investigate. In terms of loyalty and attendance, could you tell me anything about that?

TRIBERT: Loyalty, I don't know. Attendance, it was fair—nothing unusual about it.

DONNELL: But he was terminated for what, just—

TRIBERT: No, he was basically terminated because—two things: the load that we had and his contribution were not all that swift—and we decided we could do without him and we let him go.

Plaintiff certified that he "definitely did not have either Halley or Donnell contact defendants for the purpose of getting evidence on which [he] could base a law suit."

Two weeks after the Donnell–Tribert conversation, plaintiff filed his complaint. During pre-trial discovery, plaintiff disclosed that during the ensuing months after removing Solbern from his resume, he applied to an additional twenty-five employers and received three offers of employment. He eventually accepted a job paying $22,500 per year plus an eight percent bonus, or a total of $24,300, but which provided benefits having a value of $2,000 less than the benefits he received at Solbern.

At his deposition, plaintiff testified that he did not feel that he suffered any damages as a result of the statements made by Tribert to Halley and Donnell following their request for a reference. Moreover, the deposition testimony of both Halley and Donnell demonstrates that neither Halley's nor Donnell's opinion of plaintiff changed as a result of Tribert's statements.

## II

We first address plaintiff's claim that defendants violated CEPA. Plaintiff alleged two distinct claims under CEPA: (1) a claim for damages caused by negative job references made by Tribert in retaliation for plaintiff's reporting Howden to OSHA; and (2) a claim for retaliatory discharge. The motion judge concluded that: (1) the CEPA prohibition of "any retaliatory action" by an employer does not apply to retaliatory negative references; and (2) plaintiff's CEPA claim for retaliatory discharge was barred by the statute of limitations.

Plaintiff appeals contending that he has an actionable claim under CEPA for damages caused by defendants' retaliatory negative references and that he may also maintain an action for a continuing CEPA violation which began with his wrongful dis-

charge and ended with the negative references. We turn first to the question of whether negative retaliatory references are actionable under CEPA. Plaintiff argues: "There is nothing in CEPA which says or implies that the only type of retaliatory conduct it prohibits is a wrongful discharge." He further contends:

Among the most important "terms or conditions" of any employment are the references that the employer will give to potential future employers. Each of Tribert's retaliations against plaintiff by responding to requests for references by blacklisting and slandering him was therefore an "adverse employment action" against plaintiff and violated CEPA.

Defendants argue to the contrary, stating that "an adverse employment action 'in the terms and conditions of employment' cannot, by definition, include a *post-employment* negative reference." We agree.

CEPA's history has been reviewed exhaustively, most recently in *Regan v. City of New Brunswick*, 305 *N.J.Super.* 342, 702 *A.2d* 523 (App.Div.1997), and need not be reiterated here. We do, however, recognize the purpose of CEPA "to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct," and that CEPA should be liberally construed to achieve its remedial purpose. *Abbamont v. Piscataway Township Bd. of Educ.*, 138 *N.J.* 405, 431, 650 *A.2d* 958 (1994). Still, CEPA's express language, as well as the Supreme Court's opinion in *Young v. Schering Corp.*, 141 *N.J.* 16, 660 *A.2d* 1153 (1995), clearly indicate that CEPA does not apply to post-employment retaliatory negative references.

While construing the applicability of CEPA's waiver provision to claims other than retaliatory discharge claims and agreeing "with the Appellate Division's factual analysis in determining why certain claims were not waived," *id.* at 31, 660 *A.2d* 1153, the Supreme Court stated in *Young* that " '[t]he language "other adverse employment action taken against an employee *in the terms and conditions of employment* " in *N.J.S.A.* 34:19–2e (emphasis added), does not include actions which might affect an employment relationship, or potential employment relationship,

between the employee and a third party.'" *Id.* at 32, 660 *A.*2d 1153 (quoting *Young v. Schering Corp.,* 275 *N.J.Super.* 221, 239–40, 645 *A.*2d 1238 (App.Div.1994)). The plaintiff in *Young* brought a CEPA claim against his former employer, alleging that it terminated him for objecting to company research practices. *Id.* at 21–22, 660 *A.*2d 1153. Like plaintiff here, the plaintiff in that case also asserted claims for post-employment defamation, slander and malicious interference with prospective employment. *Id.* at 23, 660 *A.*2d 1153.

In holding that the plaintiff's common law claims were not waived, the Court in *Young* stated that "'[e]ven if plaintiff can establish that ... [his employer] interfered with prospective employment opportunities, such conduct will not constitute a violation of CEPA.'" *Id.* at 32, 660 *A.*2d 1153 (quoting *Young, supra,* 275 *N.J.Super.* at 239–40, 645 *A.*2d 1238). The statute, according to the Court, "'covers action taken only with respect to the employment relationship established between the employer and employee.'" *Ibid.* (quoting *Young, supra,* 275 *N.J.Super.* at 240, 645 *A.*2d 1238). The Supreme Court's approval of this court's construction of CEPA in *Young, supra,* 275 *N.J.Super.* 221, 645 *A.*2d 1238, is contrary to plaintiff's assertion that CEPA applies to post-employment negative retaliatory references.

Moreover, CEPA defines "employee" as "any individual who performs services for and under the control and direction of an employer...." *N.J.S.A.* 34:19–2b. The use of the present tense—"performs"—suggests the Legislature intended to include under CEPA only adverse employment actions that are taken against an employee while he or she is still an employee, and not after termination. Along similar lines, the Legislature distinguished "employees" from "former employees" in *N.J.S.A.* 34:19–5 by allowing "former employees" terminated in violation of CEPA one year to file an action under the Act. If the Legislature intended "terms and conditions of employment" to include job references given by an employer for former employees, then it would have included the term "former employees" in *N.J.S.A.* 34:19–2e, which defines "retaliatory action."

We also reject plaintiff's argument, predicated on *Robinson v. Shell Oil Co.*, 519 *U.S.* 337, 117 *S.Ct.* 843, 136 *L.Ed.*2d 808 (1997), that retaliatory negative references constitute "adverse employment action" under *N.J.S.A.* 34:19–2e. The United States Supreme Court in *Robinson* held that a former employee could maintain an action under Section 704(a) of Title VII of the Civil Rights Act of 1964, *see* 42 *U.S.C.* § 2000e–3(a), for an employer's post-employment negative retaliatory references. *Id.* at ——, 117 *S.Ct.* at 849, 136 *L.Ed.*2d at 816–17. The Court's decision in *Robinson* was based on an ambiguity in the definition of the word "employee" in the statute. *See* 42 *U.S.C.* § 2000e(f). "Employee" is defined as " 'an individual employed by an employer.' " *Id.* at ——, 117 *S.Ct.* at 846, 136 *L.Ed.*2d at 814 (quoting 42 *U.S.C.* § 2000e(f)). The Court concluded that it was unclear whether the term included a company's former employees, and held that former employees were protected because the statute lacked any "temporal qualifier" indicating that it only covered present employees. *Robinson, supra,* 519 *U.S.* at ——, 117 *S.Ct.* at 846–47, 136 *L.Ed.*2d at 813–15.

Unlike the statute at issue in *Robinson,* there is no ambiguity in CEPA regarding who is an "employee" for purposes of *N.J.S.A.* 34:19–2b and –2e. Further, as the Third Circuit noted in *Nelson v. Upsala College,* 51 *F.*3d 383, 388 n. 7 (3d Cir.1995), also involving a Title VII claim, "the possibility that the denial of a retaliation claim for conduct not related to an employment relationship will discourage Title VII activity is slight because serious retaliatory conduct unrelated to an employment relationship will be actionable under state law." That rationale is equally applicable here.

Plaintiff also contends that his CEPA claim for wrongful discharge should not have been barred by the statute of limitations because "the discharge was part of a continuing series of CEPA violations, including defendants' retaliatory negative references, which tolled the running of the limitations period on the discharge."

CEPA's statute of limitations provision states: "Upon a violation of any of the provisions of this act, an aggrieved employee or former employee may, *within one year,* institute a civil action in a court of competent jurisdiction." *N.J.S.A.* 34:19–5 (emphasis added). Plaintiff was terminated on March 9, 1989, but did not file his CEPA claim until December 31, 1990, almost twenty-two months later. Were we to accept plaintiff's contention, however, we would measure the running time of the limitations period from the last occurrence, the last act of alleged retaliatory negative references, and not from the first occurrence, plaintiff's termination. *West v. Philadelphia Elec. Co.,* 45 *F.*3d 744, 754 (3d Cir.1995).

▉ We conclude that plaintiff's CEPA wrongful discharge claim was properly dismissed as time-barred, and that the conduct alleged by plaintiff does not fit within the "continuing violation" doctrine. The alleged conduct here is more akin to two separate and distinct employer actions, and not "intentional, pervasive, and regular," *id.* at 756, or "more than the occurrence of isolated or sporadic acts of intentional [conduct]," *id.* at 755 (citation omitted). Plaintiff's termination was a "discrete event" which triggered his duty to "assert his rights arising from that deprivation." *Id.* at 756.

Clearly, Tribert's informing one unidentified prospective employer in July or August 1990 that plaintiff contacted OSHA does not constitute "a persistent, on-going pattern." *Id.* at 755; *see also Terry v. Mercer County Bd. of Chosen Freeholders,* 173 *N.J.Super.* 249, 253, 414 *A.*2d 30 (App.Div.1980), *modified on other grounds,* 86 *N.J.* 141, 430 *A.*2d 194 (1981) (involving alleged discrimination in the payment of wages over of period of time, such that each pay period constituted a continuing violation of the relevant statute); *Decker v. Board of Educ.,* 153 *N.J.Super.* 470, 474, 380 *A.*2d 285 (App.Div.1977) (same), *certif. denied,* 75 *N.J.* 612, 384 *A.*2d 842 (1978); *see also Havens Realty Corp. v. Coleman,* 455 *U.S.* 363, 381, 102 *S.Ct.* 1114, 1125, 71 *L.Ed.*2d 214, 230–31 (1982) (involving alleged discrimination under the federal Fair Housing Act where the defendant appeared to have a policy of denying the availability of housing to African–Americans, and

under that policy, engaged in a series of violations of a single section of the statute).

Further, as defendants point out, courts applying the continuing violation doctrine in other contexts have held that negative references following an alleged retaliatory discharge do not constitute a "continuing violation." *See, e.g., Berry v. Board of Supervisors of L.S.U.,* 715 *F.*2d 971, 980 (5th Cir.1983) ("[C]ases where an employee is discharged without the actionable period but is injured by his former employer's discriminatory references within the period, indicate that the latter acts are not a continuation of the initial discharge."), *cert. denied,* 479 *U.S.* 868, 107 *S.Ct.* 232, 93 *L.Ed.*2d 158 (1986); *Tarvesian v. Carr Div. of TRW, Inc.,* 407 *F.Supp.* 336, 338–40 (D.Mass.1976) (holding that the plaintiff's charges of negative references given by his former employer "simply do not constitute a 'continuing pattern of discrimination' as that term has been developed in case law" and that "[t]he mere insertion of the word 'continuing' into an otherwise unconnected sequence of events does not create a pattern of the kind necessary to suspend the normal time limitations on Title VII actions").

## III

Plaintiff argues on appeal that the trial court erred in dismissing his common law wrongful discharge claim. The trial court dismissed the wrongful discharge claim because (1) plaintiff waived this claim by bringing an action under CEPA for retaliatory discharge based on the same proofs, and (2) plaintiff informed OSHA of Howden's dangerous workplace only after he was discharged.

Since we conclude that the motion judge correctly dismissed plaintiff's common law wrongful discharge claim on the merits, we need not consider the first reason relied upon by the trial judge, which predated our decision in *Crusco v. Oakland Care Ctr., Inc.,* 305 *N.J.Super.* 605, 702 *A.*2d 1363 (App.Div.1997) (holding that a former employee's assertion of a CEPA claim in a complaint did not bar her from bringing a common law wrongful discharge claim, where the CEPA claim was time-barred). *See*

also *Ballinger v. Delaware River Port Auth.*, 311 *N.J.Super.* 317, 709 *A.*2d 1336 (App.Div.1998) (following *Crusco* and holding that plaintiffs who erroneously pled an unavailable CEPA claim were not barred from asserting wrongful discharge claims based on the same proofs). Plaintiff's common law wrongful discharge claim was properly dismissed on the merits because plaintiff was terminated *before* he filed his report with OSHA.

■ It is undisputed that plaintiff was an at-will employee who could be fired by defendants "for no specific reason or simply [for] bothering the boss." *Velantzas v. Colgate–Palmolive Co., Inc.*, 109 *N.J.* 189, 191, 536 *A.*2d 237 (1988). "However, a terminated at-will employee has a cause of action against the employer for wrongful termination when the discharge violates state law or public policy." *Id.* at 191–92, 536 *A.*2d 237 (citing *Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58, 417 *A.*2d 505 (1980)).

A common law claim under *Pierce*, though, has been distinguished from the broader CEPA claim:

> Although the enactment of CEPA did not abolish the *Pierce* common-law cause of action, we are persuaded that the Legislature intended that the *N.J.S.A.* 34:19–8 waiver prevent an employee from pursuing both statutory and common-law retaliatory discharge causes of action. It thus sought to curtail essentially cumulative remedial actions. The CEPA cause of action benefits the employee because notification or threatened notification to a public body or a supervisor of illegal employer conduct is sufficient. *N.J.S.A.* 34:19–3, subd. a. *Under Pierce, however, there must be actual notification to a governmental body of illegal employer conduct.*
>
> [*Young v. Schering Corp.*, 141 *N.J.* 16, 27, 660 *A.*2d 1153 (1995) (emphasis added) (citation omitted).]

This, defendants argue, is dispositive of plaintiff's *Pierce* claim because he reported the allegedly dangerous working conditions to OSHA *after* his termination.

We agree with that proposition and also with defendants' additional argument that

> no New Jersey case has recognized a claim for wrongful discharge based solely upon an employee's internal complaints about a corporate decision, where the employee has failed to bring the alleged violation of public policy to any governmental or other outside authority or to take other effective action in opposition to the policy.... Therefore, the mere voicing of opposition to corporate policy within a corporation provides an insufficient foundation for assertion of a *Pierce* claim.

[*House v. Carter-Wallace, Inc.*, 232 *N.J.Super.* 42, 48–49, 556 *A*.2d 353 (App. Div.), *certif. denied*, 117 *N.J.* 154, 564 *A*.2d 874 (1989); *see also LePore v. National Tool and Mfg. Co.*, 115 *N.J.* 226, 557 *A*.2d 1371 (involving a plaintiff who actually reported safety violations to OSHA prior to his termination), *cert. denied*, 493 *U.S.* 954, 110 *S.Ct.* 366, 107 *L.Ed.*2d 353 (1989).]

Plaintiff was terminated almost two months after he delivered his note concerning the crane and hoist to Tribert. Further, plaintiff testified at his deposition that he "orally informed Tribert about [the dangerous conditions at Solbern] and asked that they be corrected" several times between the summer of 1988 and January 1989. Plaintiff did not notify OSHA of these conditions until "the latter part of April," almost two months after his March 9, 1989, termination. Thus, as in *House, supra*, there is no basis for inferring that defendants discharged plaintiff in order to prevent him from communicating information about defendants' dangerous workplace to outside parties. 232 *N.J.Super.* at 51, 556 *A*.2d 353.

## IV

Plaintiff argues that the trial judge, on plaintiff's cross-motion, "erred in not granting plaintiff a partial summary judgment that defendants' discharge of plaintiff was retaliatory for merely attempting to protect his right to a safe workplace." This argument is completely without merit and does not warrant discussion in a written opinion. *See R.* 2:11–3(e)(1)(E).

## V

▮▮ Plaintiff contends that the trial judge "erred in dismissing plaintiff's slander cause of action on the ground that the publication of the slander was to agents of plaintiff," and that plaintiff invited the remarks.

[T]o prove defamation, a plaintiff must establish, in addition to damages, that the defendant (1) made a defamatory statement of fact (2) concerning the plaintiff (3) which was false, and (4) which was communicated to a person or persons other than the plaintiff. The fifth element that must be proven is fault. Where .. [the] plaintiff is a private figure and the speech is about an exclusively private concern, a traditional negligence standard of fault is applicable, which is defined as communicating the false statement while acting negligently in failing to ascertain the truth

or falsity of the statement before communicating it. Fault may also be established by showing that [the] defendant knows the statement is false and that it defames plaintiff or [the] defendant acts with reckless disregard of its truth or falsity. [*Feggans v. Billington*, 291 *N.J.Super.* 382, 390–91, 677 *A.2d* 771 (App.Div.1996) (citations omitted).]

■ Defendants assert that the "trial court properly dismissed plaintiff's slander claim because the statements attributed to Tribert were not published and were protected by a qualified privilege." As we have noted, Tribert admitted that he informed one unidentified prospective employer that plaintiff reported Howden to OSHA and that plaintiff "might be known as the type of person that called OSHA." These statements, however, are not actionable because they are true and lack sufficient proof. *See R.* 2:11–3(e)(1)(E).

■ Tribert also made defamatory statements to plaintiff's friends, Halley and Donnell, who posed as prospective employers. These statements also do not form the basis for a slander claim because they were not published. The *Restatement (Second) of Torts* § 577 cmt. e, at 203 (1977), provides that "the communication to a servant or agent of the person defamed is a publication although if the communication is in answer to a letter or a request from the other or his agent, the publication may not be actionable in defamation." Further, "[a]n honest inquiry or investigation by the person defamed to ascertain the existence, source, content or meaning of a defamatory publication is not a defense to an action for its republication by the defamer." *Id.* § 584, at 242. "The rule stated in [Section 584] is applicable only to the publication of defamatory matter at the request or procurement of a plaintiff who acts honestly for the purpose of ascertaining the existence, source, content or meaning of a prior defamatory publication." *Id.* § 584 cmt. a, at 242. "To come within [Section 584], the defamatory matter must be repeated. The mere acknowledgment of a previous publication is not a republication." *Id.* § 584 cmt. c.

When the publication of defamatory matter has been invited, instigated or procured by the one defamed, or by someone acting on his behalf, he generally cannot be heard to complain of the resulting injury, particularly, when it is elicited for the purposes of predicating an action thereon. However, the action would not be barred if the plaintiff, or someone at his request, made or caused the inquiry to

be made in good faith so as to ascertain whether defamatory charges had been made against him or perhaps to seek clarification of an ambiguous remark. [*Mick v. American Dental Ass'n*, 49 *N.J.Super.* 262, 275, 139 *A.*2d 570 (App.Div.) (citations omitted), *certif. denied*, 27 *N.J.* 74, 141 *A.*2d 318 (1958).]

The plaintiff in *Mick* was a dentist active in opposing fluoridation who requested his friend to write a letter to the defendant to find out what the defendant might say about him. He testified that

he had read that the Bureau of Public Information of the American Dental Association had invited inquiries with respect to the opposition to fluoridation and he requested [his friend] to write the letter because he "was always being kidded [by all his associates] about being opposed to fluoridation * * *" "I had been so active in opposing fluoridation in the Army and before I went into the Service, I wondered if they had anything on me. It was curiosity."

[*Id.* at 271, 139 *A.*2d 570.]

In *Mick*, we held that the plaintiff's action was

barred on the theory of invitation or consent. It is offensive to an elementary sense of justice that after securing defendant's candid expression of its opinion of plaintiff's views on fluoridation through his use of [his friend's] letter as a provocative decoy, he should be permitted to sue for the injury he thus invited.

[*Id.* at 276, 139 *A.*2d 570.]

Defendants are correct in their contention that "[c]ontrary to plaintiff's assertion, Dr. Mick *did not* request that his friend write the Association for the purpose of eliciting statements that could form the basis of a legal action."

We also agree with defendants that *Mick* "is strikingly similar to this action" and that the "good faith" exception as explained in *Mick* and the *Restatement* does not apply here. Neither Halley nor Donnell contacted Tribert to ascertain "the existence, source, content or meaning of a prior defamatory publication." *Restatement, supra*, § 584 cmt. a. Rather, like the plaintiff in *Mick*, they and plaintiff were curious as to what Tribert might say about plaintiff. As defendants point out, Halley and Donnell "had no knowledge that Tribert had previously made any slanderous remarks, and were not inquiring concerning the substance of any such previous remarks." Since Halley's and Donnell's communications with Tribert served as "provocative decoys," plaintiff "should [not] be permitted to sue for the injury he thus invited." *Mick, supra*, 49 *N.J.Super.* at 276, 139 *A.*2d 570.

██ Moreover, in our view, Tribert's defamatory statements to Halley and Donnell may not be actionable because the statements were either true, *see Kass v. Great Coastal Express, Inc.*, 291 *N.J.Super.* 10, 18, 676 *A.*2d 1099 (App.Div.1996), *modified on other grounds*, 152 *N.J.* 353, 704 *A.*2d 1293 (1998), or protected by the qualified privilege, *id.* at 19, 676 *A.*2d 1099. Although we recognize that a portion of Tribert's comments arguably were based on his conjecture,[3] even that statement may be subject to a qualified privilege. *See ibid.; see also Erickson v. Marsh & McLennan Co., Inc.*, 117 *N.J.* 539, 563, 569 *A.*2d 793 (1990) (discussing qualified privilege generally). Because we conclude that plaintiff's slander claim based on these statements is barred by *Mick, supra*, we need not consider the applicability of qualified privilege.

## VI

██ Plaintiff also claims that the trial court erred in dismissing his claim for intentional interference with a prospective economic relationship. The trial court held that "[t]here is absolutely nothing ... which ... anyone could even infer that ... a [slanderous] statement was made to other prospective employers, other than [plaintiff's] friends, and which resulted in the plaintiff not receiving a job that he otherwise would have received. Therefore, [defendant's] motion [for summary judgment] is granted."

██ To prove a claim for interference with an advantageous economic relationship, plaintiff must show: (1) the existence of a reasonable expectation of economic advantage; (2) intentional and malicious interference with that expectation, (3) the interference caused plaintiff to lose the prospective economic advantage; and (4) damage. *See Printing Mart–Morristown v. Sharp Electronics Corp.*, 116 *N.J.* 739, 751–52, 563 *A.*2d 31 (1989).

---

[3] As noted in the reproduction of Tribert's conversation with Donnell, *supra* page 5, Tribert accused plaintiff of "planting evidence" in anticipation of OSHA's investigation. In Tribert's deposition, he admitted that he did not know, in fact, that plaintiff had "planted evidence," but he suspected that plaintiff had done so.

Plaintiff's claim here clearly fails for lack of sufficient evidence. He offered no proof that any of the 125 firms to whom he applied for employment was actually in contact with Tribert. Although Tribert admitted communicating with one unidentified prospective employer, plaintiff is unable to demonstrate that the employer failed to offer a position to plaintiff due to the information provided by Tribert. Moreover, Tribert's statement to the unidentified caller was true, and thus plaintiff's claim is foreclosed. *See C.R. Bard, Inc. v. Wordtronics Corp.*, 235 *N.J.Super.* 168, 173–74, 561 *A.*2d 694 (Law Div.1989).

We have thoroughly canvassed the record. We conclude the motion judge properly granted each of defendant's successive motions for partial summary judgment.

Affirmed.